David Hampshire, Attorney for Petitioner Thuong Nguyen We present two independent arguments, each which we believe mandate reversal of the Merit System Protection Board decision that upheld the demotion of Mr. Nguyen. First, no one argues, including Respondent, that a federal agency can lawfully discipline an employee more than once for the same misconduct. But surely nobody argues as well that a U.S. Attorney can't simply discretionarily say, yeah, we understand. Look, we're not saying that you're a bad person. We're simply saying that we can't take the chance of putting you on the stand and having somebody cross-examine you. That's correct. Can I get to that point in one minute? We do acknowledge that the U.S. Attorney has that discretion. What we're focusing on is the agency, the federal agency, and how it treats its employees, both in terms of due process, which is our second argument, and in terms of disciplining an employee more than once for the same misconduct. Well, I want you to go there. Did your client, he had a relationship. Did he pick up, is there anything in the record that shows he picked up the phone and called the USA and said, hey, I'm good. I can testify. And if so, what did they say? Is it in here? First of all, I don't think my client would be required to do that. I didn't say required. I said, why isn't it in here? He did have that kind of relationship and he did talk to people. I'm not sure it's in the record. I couldn't find it. I lost it. Right. And he was told that we'll decide that later. And then he was confronted with a decision that he would not be allowed to testify because of what's called Giglio implications, that he had his prior misconduct had raised credibility questions. With respect to this, what you characterize somewhat of a double jeopardy type argument where you say he was punished for the same thing twice. Isn't it true that the first time he was actually punished for his misconduct, the second time it was simply a demotion that was required in response to the U.S. Attorney's Giglio determination? Okay. First of all, let me speak to the word required. It was not required. The case that was cited by the government, the Doe case versus the Department of Justice, is an example of how an agency can proceed in this situation. There, the American System Protection Board reversed the agency, the person, the determination of the employee. The person was reinstated. He then brought a petition for enforcement and said, hey, they're not letting me do my job. They're not letting me testify. But he was put back in his GS-12 criminal investigator position, and that duty was not given to him. So the agency didn't deprive him of property interests. What job could he possibly do? I mean, if he can't testify and he can't swear a complaint, what's left for him to do? Well, in the Doe case, they found duties for that employee. What the problem is here is that in 2008, when Mr. Nguyen was first confronted with this misconduct, the agency could have and should have gotten the input from the U.S. Attorney's Office. They should have asked if there would be a Giglio problem for this employee. They considered it, but they never asked the U.S. Attorney. So then two years later, the U.S. Attorney expresses, the office expresses its opinion, and then he was told back, and this was the employee's second time. Because he told them at that point. Well, they asked him, do you have any prior discipline? And he said, well, yeah, I got this 14-day suspension. They didn't ask him why the agency didn't sustain any more discipline. They didn't ask him what, what did you say to the agency? What's your explanation? Because our second argument is due process, the ability to have a meaningful opportunity to respond. But the issue here is... We can't order the U.S. Attorney to withdraw the Giglio's term, and neither could the agency, correct? Right. So, are you saying that before they're allowed to discipline an employee, they have to go to the U.S. Attorney's office and say, if we discipline this person for wrongdoing that we found occurred, will that cause a problem? Well, here's what I'm saying. There are three types of situations where this arises. One, the employee is hired or promoted to a criminal investigator position, a law enforcement position. He's asked for his background. Then, if his background reveals questionable activities, then the agency can go to the U.S. Attorney, do you have a problem with this? And they can deny the person that position or that promotion. My other question is, how can ICE force the U.S. Attorney to adopt the kind of procedure that you're talking about? They don't have any authority to do that, right? No, their authority is over the employee, and their obligation is to... They're stuck with what the U.S. Attorney... No, not necessarily. If this thing had proceeded as it should have in 2008, the employee would have responded both to the agency and to the concerns raised by the U.S. Attorney. In fact, he did respond to the agency. He was able to convince them that he was not guilty of lack of candor or falsification, and they kept him in his criminal investigator position. The second time, he had no ability to do that. They said, you can't talk to the U.S. Attorney. We don't know why they wrote this one-page letter, but we're going to have to look at it. Because the U.S.A. looked at it and said, look, it may well be that he's clean as a hound's tooth, but we're not going to show him to a jury because they might find that he's not credible because of this background. Because OPM did find against him with respect to those credibility issues and those misconduct issues, right? I'm sorry, OPM... The OPR, the Office of Professional... I don't believe they did. They're investigators. It was said that they made a substantiated allegation. They're investigators. They just find the facts. But it doesn't matter. What matters is that a U.S.A. looks at it and says, in their judgment, this person's damaged goods. Okay. I think we're going a little bit off... We're missing each other on parallel. And here's what I'm saying, because I really want you to understand this, because I think that this is a significant argument. The first argument is double punishment. It's like... And the MSVB has clear case law. It says you can't discipline an employee more than once for the same misconduct. Now, the question is, what misconduct did Mr. Nguyen engage in? Words have meaning, and he didn't engage in any further misconduct. What the U.S. attorney did two years later... It's not based on that. ...was to look at a new... Wait. It's not based on misconduct. That's the problem. It's based on his lacking qualification that's necessary for him to do the job. If he were a doctor, for example, and his license was taken away by the state in which he was licensed to practice medicine, the government could say, well, you don't have a license to practice medicine anymore. You can't operate as a doctor in the VA system. It's a qualification. It's not misconduct. I think your example is one by analogy. There is no authority for the U.S. attorney to qualify or to certify employees. They're not a governing board. They're not like the AMA or the Bar Association or anything like that. They express their opinion. We don't want to use him as a criminal investigator. That means that they have that discretion not to use him in particular circumstances. It's not like he's a pilot and he loses his pilot's license. It's analogous to that, but it's not the same. There are important differences. If a law enforcement officer is giglio-impaired, he's lost at least a large portion of his job. He can't be used as a witness. He's not like a pilot. He's more like an NIH investigator with the plague. I would disagree with that. The focus for me in looking at this case is the due process that was accorded the employee. I disagree. I think that if there's no misconduct, then they can't discipline the employee. If you were telling me, I'd go somewhere with you. If you were telling me that the U.S. attorney was racist and they said, we live in a racist county and we have racist juries and we won't use this guy because of his race, I'd have some real heartburn in the agency saying, okay. At some point, I can get to where you're going. We don't know what the U.S. attorney's determination was. We asked for it. We asked for a discovery. We asked for it when I represented the employee in the oral reply. We were told you won't find that out. We don't know. They issued a one-page letter. He had the ability to ask for it. That was the beginning of my dialogue with you. You conceded he had a relationship with them. He had an informal relationship with them. I don't think that that accords him his constitutionally guaranteed right of specificity so he'd know exactly what they relied on and he can respond to the person with authority to make a decision. He could talk in the hall with them or grab a cup of coffee, but I don't think that's the same as having the right to respond once they decide this is the action we're going to take. My focus is not on the U.S. attorney. My focus is on the agency. The agency took this action both as a double punishment, but also without according the employee any right to respond. They didn't take the action as punishment, did they? They weren't intending to punish him. They demoted him five steps. He can barely feed his family of four now. It was not intended as punishment, was it? It was intended to deal with lack of qualification. I think if you read the record, the proposal letter says that because of his misconduct, the U.S. attorney has found that he lacks the qualifications for the position and therefore he will be demoted. They're not taking him out and whipping him, but they are depriving him of his property interest and his job by demoting him. First they proposed to fire him. I guess that's not punishment either, but it certainly is a significant consequence of what they intended to do. Is he on the list for possibly moving up if the government ever opens again? They did look for another 12th spot for him, right? I'm not sure that they really did because there are 12 positions, there are administrative positions, there are GS-11 positions and they didn't put him in those positions. I don't want to settle the discussion that we had, but no, they didn't really look for positions for him. Mr. Ansher, do you want to say the rest of it? Yes, I do. Thank you. Thank you. Mr. Goodman. Good afternoon, Your Honor. This is the court. There's no dispute that Mr. Wynn cannot do the job of a deportation officer. He asked the agency to do something that's impossible here. He wants the agency to pay him for the job of a deportation officer even though it's acknowledged that he can't be a deportation officer, he can't do that job. Well, four steps down is pretty extreme. I mean, moving somebody out of one job into another, a four-step demotion is a pretty extreme demotion. Wasn't there anything else available at an 11th or a 12th? There's testimony in the record from Mr. Aitken that no, there wasn't anything else And he decided, as a deciding official, to keep Mr. Wynn on staff even though the proposal was to remove him. So the agency did the best they could to try to help him because it wasn't about misconduct as Your Honors have already noted. It wasn't punishment, it was, as the statute says, it was cause. So the agency can take certain actions for such cause as promote the efficiency of the service and that's what was done here because he couldn't be a deportation officer, they couldn't keep paying him to be a deportation officer. As Your Honors have noted, the decision of the AUSA about who they will and won't use is purely within the prosecutor's discretion. This is something that no agency, no other agency or the court could force the AUSA to use somebody. They couldn't do, my hypothetical, they couldn't use purely racist... No. We would certainly hope that no AUSA would ever do something like that. I'm not just saying hope. At some point it becomes reviewable. Not by the courts. It's much like a national security... Wait, wait, that can't be true. I mean it's a constitutional violation. It's a Title VII violation. Wait, wait, wait. If there were a Bivens action or something like that or if it were a state action in the context of 1983 or Title VII or something, there's a judicial remedy for this. Yes, there are judicial remedies for certain types of abuses of discretion like Title VII, as Your Honor knows, but not in this court, not through the MSPB. That's not the right way to challenge that kind of situation. Fair enough. We could look at all of this court's jurisprudence on security clearances and just substitute for security clearance, prosecutorial discretion about when somebody is IGLIO-impaired, and they would all apply. And they would all apply exactly correctly because the situation here is one that the prosecutor has the right to, the duty to, decide who they use, who they present in court, who they present to a jury. And it's not something that the other agencies can challenge. But even if it's true that ICE couldn't order the U.S. Attorney to withdraw their IGLIO, I mean, we know how this stuff works. These are two federal law enforcement agencies. Why couldn't they just sit down and say, let's look through this and see if this is really necessary? Why didn't they do that? They surely could have done that, but there's no duty that they do that. And the reason they didn't in this case is this case is very clear-cut what exactly happened. In 2007, there was an investigation done into this situation with the refrigerator, and the agency decided to cut him a break. The agency said, we're only going to give you 14 days for that. We realize there might be IGLIO concerns, but we're going to leave that. The AUSA is not making us not use you, so we're going to go ahead and keep using you. And he got to work for two more years in that capacity. They didn't, I mean, there's nothing in the record that says that IGLIO was even talked about at the point of the initial... It was, Your Honor. Page 572, I think, of the record. I'll turn to it now. There was a discussion in 2008 where Mr. Aitken, who was the proposing official back then, said this might raise some IGLIO concerns. While I'm looking at the appendix, I want to... He said that to whom? During the proposal in 2008. Where in the record? I'm sorry. I'm looking for the page right now, Your Honor. Is that Iris Paulson? If you take me more than a second, I can certainly inform the court by letter of the page number, but I'm not sure if... Did he explain that to the petitioner? When, Your Honor? When do you mean? At the time of the initial 14-day suspension. It was in the proposal. It was in the proposal discussion. I'm not sure exactly who it was presented to. I'm looking for that email now. It's an email that's in the record. The appendix is long in this case. I apologize, but I can't lay my fingers on that right now. But I know it's here. But part of the problem is that the agency, when you say the agency clearly just gave him a break, well, that may or may not be true. All we know is that the agency did not sustain the finding of lack of candor. What the agency said is that lack of candor wasn't proven to her satisfaction. That's what Ms. Alcantar decided. And that's at page 74 and 75. And I think you're referring to the testimony on 26, where he says that there wasn't a Giglio letter from the agency in 2008. There was not a Giglio letter in 2008. That's certainly true. There was discussion within the agency that it might raise Giglio concerns in 2008. That precedes that statement up in the middle of the page. To a question you asked earlier, Judge Wallach, about whether he had discussions with the AUSA, page 575 of the record, I have found that page, there's an email where he says that he learned from the AUSA that he couldn't appear in court. He says specifically that he can no longer file a complaint or appear on grand jury. So with respect to any due process issue that would be raised, and again, we don't think due process applies to the situation, but even if it did, there's no question that he got notice of exactly what he was being charged with. He knew what had happened in 2007, and he knew about the investigation. He had a copy of the Office of Professional Responsibility report of investigation, and he had responded to the agency about that. He discussed that he knew the details, that he had adequate notice, and there's no doubt that he had an opportunity to meaningfully respond. He meaningfully responded, and it resulted in a demotion rather than a removal based on his responding. So he got any due process, he might have been due. I'd also like to direct this Court's attention, we don't cite it in our brief, but to the Gargiulo case where the Court made clear that due process concerns aren't implicated. The real question is whether 7513 is complied with, and here they don't even allege 7513 wasn't complied with. He got all the notice and process due under the statute, and constitutional concerns wouldn't be raised if the statute's complied with because it provides all the process that would be due. With respect to his double jeopardy contention, I'd just stress that, again, it's not about misconduct, it's about cause, it's not double jeopardy because what happened is in 2010, as the Court's well aware, the AUSA wrote a letter, and that was the sole basis, and the official explained in great detail, and it's all in the record exactly, that that was the basis for his demotion. It was not punishment for something that happened earlier. The thing that's most troubling to me about the whole record is that the AUSA letter says that the lack of candor allegation was sustained, and that's wrong. It was sustained in the OPR report. They used the language sustained. So in the OPR report, they have five charges, and they say as to four of them, I'm sorry, they say substantiated. So there's one unsubstantiated claim and then four substantiated claims, and that's the conclusion of OPR. And the AUSA's letter makes clear that that's what they were looking at, and that was their concern, is the OPR decided that lack of candor was substantiated. So that was enough for the AUSA to say, we can't use you, regardless of whether the agency thought that was enough to justify a removal action. So they're two different standards. Again, much like in EGAN, it's two different standards. We're trying to compare apples and oranges. And ultimately, it's a question for the prosecutor, and not for the MSTB to review. If there are no further questions, we respectfully request a sign. Thank you, Mr. Richards. Let me just respond to the question about whether Mr. Aitken was looking at particular implications. He was, and he did send an email to his labor relations person saying, we have to fire Mr. Nguyen because of the giggling implications of his misconduct. And I can cite, give me one second, I can cite where it is. I think it's also listed in the original proposal letter, 2008 proposal letter, which is starting page 69. And, let's see, the page 165, in A165, 164 and 165, I believe, contains those emails. And I turn it around because the agency did have Giglio on its mind in 2008. And they could have gone to the U.S. attorney then to get their opinion as to whether Mr. Nguyen would be Giglio impaired. But for whatever reasons, they didn't. And Mr. Nguyen didn't commit any more misconduct. There's only one act of misconduct. Then the U.S. attorney came in  a new concern about that one act of misconduct. And under the words precedent in a number of cases, they said that you can't discipline an employee twice for the same misconduct. That's the language they used. So here, even though there was new consequence that was cited by the U.S. attorney, they did discipline Mr. Nguyen twice for the same act of misconduct. And that is violative of the MSPB case law, and I think this court in an unpublished decision upheld the Meritus Protection Board in Cooper v. VA in 2012-2013. Then in terms of due process, what we're saying is it's the agency's responsibility to provide the employee, in this case Mr. Nguyen, due process. And that means a meaningful opportunity to respond. Here, as was cited, we don't know why the U.S. attorney decided the way they did. We had no input into their thinking, what they saw in the report of investigation. They certainly differed from what the agency saw after Mr. Nguyen had an opportunity to respond. Okay, Mr. Henshaw, I think we're out of time. Okay, thank you very much for your time. Thank you. Thank both counsel, the case is submitted, and that concludes our session for the day. All rise. The honor court is adjourned until 8 a.m.